The **TRAVELERS INSURANCE COM-PANY**, a corporation, Appellant,

v.

**BLUE CROSS OF WESTERN PENN-SYLVANIA**, a corporation.

No. 72-1209.

United States Court of Appeals,
Third Circuit.

Argued April 24, 1973.

Decided July 10, 1973.

Frank L. Seamans, Donald C. Winson, Dale Hershey, David E. Tungate, Eckert, Seamans, Cherin & Mellott, Pittsburgh, Pa., and George D. Brodigan, Hartford, Conn., for appellant.

Robert J. Bagdasarian, Charles Kadish, Donald B. Da Parma, William B. Sneirson, Breed, Abbott & Morgan, New York City, and Edward L. Springer, Springer & Perry, Pittsburgh, Pa., for appellee.

Before VAN DUSEN, ALDISERT and ROSENN, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

Travelers Insurance Company appeals from the January 6, 1972, district court order dismissing its complaint against Blue Cross of Western Pennsylvania, which order was entered after a trial to the court, 361 F.Supp. 774. Travelers had charged Blue Cross with restraining trade, in violation of section 1 of the Sherman Act, 15 U.S.C. § 1 (1970),[1] and with monopolizing and attempting to monopolize, in violation of section 2 of that Act.[2] To prevail, Travelers had also to establish that either Blue Cross' conduct did not come within the protective umbrella provided by the language of the McCarran-Ferguson Act, 15 U.S. C. § 1011 et seq. (1970),[3] or was exclud-

1. "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States . . . is declared to be illegal . . . ."

2. "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States . . . shall be deemed guilty of a misdemeanor . . . ."

3. § 1012(b) provides:
   " . . . the Sherman Act . . . shall be applicable to the business of insurance to the extent that such business is not regulated by State law."

ed from the protection of that Act by the presence of boycott, coercion, or intimidation, see 15 U.S.C. § 1013(b) (1970).[4] After a lengthy non-jury trial, the district court concluded that Blue Cross' conduct was immunized by the McCarran-Ferguson Act and that, even absent such protection, the conduct did not violate the antitrust laws. See Travelers Ins. Co. v. Blue Cross of Western Penn., 361 F.Supp. 774 (W.D.Pa. 1972) (1972 Trade Cas. ¶ 73,311, at 91,428).[5] We agree with the district court on both points.

The relevant market consists of 29 counties in Western Pennsylvania. Blue Cross provides hospitalization insurance for 51% of the population of this area; and during a relevant period Blue Cross accounted for 62% of all the patient days which were covered by commercial insurance.[6]

Travelers objects to a standard contract which Blue Cross has with 101 hospitals in this area which prescribes the amounts and terms under which Blue Cross pays for the services rendered its subscribers. Blue Cross reimburses hospitals only for audited costs subject to a ceiling;[7] and these costs do not include any portion of the general hospital expenses of capital construction, of providing free services to indigents, and of providing service to patients who default. Because of these limitations, Blue Cross pays some 14–15% less than the amounts that non-Blue Cross patients are charged.[8] Consequently, Blue Cross quotes rates for hospitalization insurance correspondingly lower than the rates of private insurance companies such as Travelers.

Whether the McCarran-Ferguson Act exempts Blue Cross' arrangement with these hospitals from antitrust scrutiny depends, first, on the scope of the statutory term "business of insurance," second, on the extent of state regulation of this arrangement, and, third, on the presence or absence of boycott, coercion or intimidation.

The Supreme Court's most recent interpretation of the McCarran-Ferguson Act appears in SEC v. National Securities, Inc., 393 U.S. 453, 457–461, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969), where the Court held that a state insurance department's approval of a merger of insurance companies would not exempt the merger from the federal securities laws. The Court reasoned that regulation of the "business of insurance" meant control over the relationship between the insurance company and its policyholders; the term did not encompass regulation of the relationship between the company and its shareholders. However, although the Court fashioned this dichotomy, it did not fix the exact contours of the term "business of insurance." Rather, it indicated activities clearly covered—fixing rates, selling and advertising policies, licensing companies and agents, prescribing the types of permissible policies, etc.—and suggested the possibility of additional ones, using this language:

"Undoubtedly, other activities of insurance companies relate so closely to their status as reliable insurers that

4. "Nothing contained in this chapter shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or any act of boycott, coercion, or intimidation."

5. The findings in this opinion are not clearly erroneous. See F.R.Civ.P. 52. Earlier district court opinions in this case are Travelers Ins. Co. v. Blue Cross of Western Penn., 306 F.Supp. 219 (W.D.Pa. 1969), and Travelers Ins. Co. v. Blue Cross of Western Penn., 298 F.Supp. 1109 (W.D.Pa.1969).

6. There were also patients who qualified for Medicare or Medicaid, etc., or who were not covered by any form of reimbursement for hospital or medical costs.

7. This ceiling varies for each of nine categories of hospitals.

8. The district court opinion makes clear that the volume of Blue Cross subscribers and its cooperative coverage of many poor risk subscribers (such subsidization amounted to $27,000,000. in the years 1960–1970; 700a–701a) are important factors in its ability to negotiate favorable contracts with the hospitals subject to the approval of the State Insurance Department, see 40 P.S. § 1404.

they too must be placed in the same class." 393 U.S. at 460, 89 S.Ct. at 568.

Two district court cases which pre-dated SEC v. National Securities, Inc., nevertheless are useful for comparison with the present case. In California League of Independent Insurance Pro-ducers v. Aetna Casualty & Surety Co., 175 F.Supp. 857, 860 (N.D.Cal.1959), the "business of insurance" was held to include the size of commissions paid by companies to agents, because commis-sions were a vital factor in the compa-nies' ratemaking structure. In contrast, the district court in Hill v. National Auto Glass Co., 293 F.Supp. 295 (N.D. ·Cal.1968), held that the McCarran-Fer-guson Act would not protect Allstate, an automobile liability insurer, which alleg-edly secured installation jobs for select-ed automobile glass dealers. It can be surmised that the impact on Allstate's rates of the expense of replacing auto-mobile glass, while it might be direct, would not be substantial.

In the present case, the district court found that the interrelationship of hospital payments and subscribers' rates was such that Blue Cross' arrangement with hospitals should be considered part of the "business of insurance." This conclusion is a sound construction of the law and is amply supported by the evidence.[9]

Also, the evidence supports the district court finding that the state regulates the arrangement here in ques-tion. Section 4 of the Nonprofit Hospi-tal Plan Act, Penn.Stat.Ann., tit. 40, § 1404, provides that:

"The rates charged to subscribers by nonprofit corporations, . . . all rates of payments to hospitals made by such corporations pursuant to the contracts provided for in this act, . . . and any and all contracts en-tered into by any such corporation with any hospital, shall at all times, be subject to the prior approval of the Insurance Department."[10]

One recent case suggests that the mere existence of such a scheme of regulation, even if ineffective and unenforced, is sufficient to invoke the McCarran-Fer-guson Act. Ohio AFL–CIO v. Insurance Rating Board, 451 F.2d 1178 (6th Cir. 1971), cert. denied, 409 U.S. 917, 93 S. Ct. 215, 34 L.Ed.2d 171 (1972). How-ever that may be, the record here shows aggressive state regulation.[11] In fact, as the district court found, the features of the contract which Travelers finds objectionable were mandated by Insur-ance Department guidelines designed to encourage high quality care at reason-

9. One witness, Herbert S. Denenberg, the present Insurance Commissioner, testified as follows at App. 766a:
"Q. Commissioner, in carrying out the responsibilities of your office as you see them, what relation, if any, have you found to exist between a Blue Cross plan reimbursement contract with its hos-pitals and the Blue Cross plan subscriber rates?
"A. Well, these two things are really indivisible aspects reflecting the same economic forces. If you do not have a sound contract between Blue Cross and the hospitals that controls cost and qual-ity then the Blue Cross rate to the sub-scriber is going to be unreasonable. So these are typically approached together.
"Both at the hearings and in our ad-judication, we made it crystal clear that we think that these two items, the con-tract with the hospitals and the rates

to the subscribers are part of the same package and we have to regulate both of them together or that we cannot pro-vide health delivery to the public at the most reasonable cost possible."

10. We reject Travelers' argument that, to exempt conduct from the federal antitrust laws, state regulation must parallel the Sherman Act. Had Congress desired this type of regulation, it could simply have continued the applicability to insurance companies of the Sherman Act itself. Moreover, that Congress intended to allow the states to .regulate insurance on the basis of factors other than competition is conclusively demonstrated by the McCar-ran-Ferguson Act's immunization of rate-fixing.

11. See App. 761a–780a (testimony of Her-bert S. Denenberg) ; App. 659a–684a (tes-timony of Francis R. Smith).

able costs. Auditing hospital costs and establishing a ceiling were thought to help hold down rising hospital costs by forcing administrative efficiency. Blue Cross was not to contribute to the care of indigents because this responsibility belonged to the state, not to the subscribers of Blue Cross. Finally, Blue Cross was not to support hospital construction for two reasons: such construction was usually financed by the state, the federal government, or private philanthropy; and, historically, hospitals serving the same area have needlessly duplicated expensive specialized services.

■ By its terms the McCarran-Ferguson Act does not protect "boycott, coercion, or intimidation." Travelers has not challenged the finding of the district court that Blue Cross at no time tried to influence the relationship between hospitals and other insurance companies. Instead, Travelers asserts that Blue Cross used "coercion" to extract concessions from the hospitals. The district court held, and we agree with its conclusion, that the economic inducements which made the Blue Cross contract acceptable to hospitals [12] did not amount to "coercion." Especially is that true where, as here, the hospitals negotiated jointly and the resulting contract was approved by the Insurance Department.

Even if the McCarran-Ferguson Act were inapplicable and Blue Cross was subject to antitrust scrutiny, we agree with the district court that Blue Cross could withstand such scrutiny. In arriving at this result, we have not reached the determination of whether Blue Cross possesses enough market power to have "monopoly power." Even assuming that such power exists, we have concluded that Blue Cross' arrangement with hospitals neither illegally restrains trade in

violation of section 1 of the Sherman Act nor constitutes, in violation of section 2, "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." United States v. Grinnell Corp., 384 U.S. 563, 570–571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966).

■ Our section 1 analysis begins with the recognition that the situation here does not involve a vertical restraint which has achieved garden variety status. That is, it is not a tie-in, an exclusive dealing arrangement, etc. Consequently, as the district court indicated, it must be carefully looked at on its own facts, in order to reveal whether any restraint of trade it causes is "reasonable." See Northern Pacific Railway Co. v. United States, 356 U.S. 1, 4–5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); cf. Chicago Board of Trade v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683 (1918).

■ In its negotiating with hospitals, Blue Cross has done no more than conduct its business as every rational enterprise does, i. e., get the best deal possible. This pressure encourages hospitals to keep their costs down; and, for its own competitive advantage, Blue Cross passes along the saving thus realized to consumers. To be sure, Blue Cross' initiative makes life harder for commercial competitors such as Travelers. The antitrust laws, however, protect competition, not competitors; and stiff competition is encouraged, not condemned. It must be pointed out that the size of its competitors does not give Blue Cross the freedom to conduct other than fair competition for business. The dependence of the community on health facilities requires that anti-competitive practices not be tolerated.

12. If a hospital refused to agree to the contract, Blue Cross would reimburse the hospital on a per diem basis by an amount insufficient to cover the hospital's costs. A hospital would have to make up any deficiency by charging the patient directly. We note that this procedure is typical of the indemnification plans offered by private insurance companies.

■ We note that one case, United States v. New York Great A. & P. Tea Co., 173 F.2d 79 (7th Cir. 1949), seems to hold that it violates the Sherman Act for a seller to force suppliers to lower their prices to him. The *A. & P.* case, though, is distinguishable both as to the practices involved and as to the business context of these practices. In addition to its aggressive bargaining over price, A. & P. was also found to exert pressure on suppliers either not to deal or to alter their dealings with A. & P.'s competitors. No comparable conduct was shown here. In fact, the evidence does not support the proposition that Travelers or other companies could not have achieved some price reductions.[13] Moreover, A. & P. was found to have engaged on several occasions in predatory pricing—selling at retail below its wholesale cost in order to drive competing retailers out of business. This predatory conduct would have been particularly serious due to the small size of many independent grocers: once forced out of business they would be unable to re-enter the market. Here, in contrast, there was no evidence of predatory pricing. Furthermore, there is no reason to suppose that, even if commercial insurers such as Travelers were currently unable to compete with Blue Cross, they could not immediately re-enter the hospitalization insurance business if it became profitable to do so.

In regard to the Sherman Act § 2 question, we agree with the district court's determination that Blue Cross achieved its present status in a permissible manner. It was first suggested in United States v. Aluminum Co. of America, 148 F.2d 416, 429–430 (2d Cir. 1945), that a monopoly may be "thrust upon" a producer "merely by virtue of his superior skill, foresight and industry," and that such a result would not be violative of section 2.[14] In United States v. Grinnell Corp., quoted above, the Supreme Court reaffirmed this position. The district court found, on ample evidence, that Blue Cross owes its success to the completeness of its coverage. From the time of its organization in the late 1930s, Blue Cross has reimbursed hospitals for all covered services rendered its subscribers. Private companies, on the other hand, have, until relatively recently, provided only that their policyholders would be indemnified up to a set dollar ceiling.[15] Blue Cross thus has exposed itself to considerably greater risk because of the possibility that treatment would be extensive and because of the probability that hospital costs would rise. By shouldering the risk, Blue Cross has made itself considerably more attractive to consumers. The antitrust laws were not intended to condemn such conduct.

■ One final contention of Travelers may be disposed of quickly. Travelers now argues that if Pennsylvania grants a competitive advantage to Blue Cross via the operation of the McCarran-Ferguson Act, Pennsylvania denies Travelers equal protection of the laws. Travelers concedes that it did not present this argument to the district court until, after the lengthy trial, Travelers submitted a list of requested findings of fact and conclusions of law. It is questionable whether such belated presentation properly raised the issue

---

13. In its brief at 14, Travelers calls our attention to the testimony of various of its witnesses at App. 862a–863a; 890a–891a; 936a–937a; 944a. However, almost all of this evidence suggests not that Travelers was unable to obtain any price reduction from hospitals, but rather that Travelers assumed its inability to do so and, therefore, did not press the matter. Moreover, it is not clear that Travelers was wiling to adopt a full-cost reimbursement scheme comparable to that of Blue Cross (as opposed to the typical indemnification arrangement) as a quid pro quo.

14. If this would be true for a monopolist, it would apply even more strongly to the present situation in which Blue Cross clearly does not have a monopoly.

15. The commercial companies are now willing to write complete coverage for at least large-group plans. It appears that Blue Cross is still alone in offering this arrangement to small groups and to high-risk individuals.

before the district court so as to make consideration here proper. *See* Andrews v. Chemical Carriers, Inc., 457 F.2d 636 (3d Cir. 1972). In any event, the argument has little merit. In view of our holding that, independent of the McCarran-Ferguson Act, the antitrust laws were not violated, the state of Pennsylvania has not denied Travelers equal treatment in violation of the Fourteenth Amendment. Furthermore, even if McCarran-Ferguson Act protection were necessary to Blue Cross, the facts do not support the proposition that Pennsylvania's regulation of the contract between Blue Cross and the hospitals was without rational purpose, *see, e. g.,* James v. Strange, 407 U.S. 128, 92 S.Ct. 2027, 32 L.Ed.2d 600 (1972).

The judgment of the District Court will be affirmed.