Sheridan B. MANASEN, D.M.D., et al., Plaintiffs,

v.

CALIFORNIA DENTAL SERVICES, a corporation, Defendant.

No. C–75–0329 WHO.

United States District Court, N. D. California.

Nov. 4, 1976.

Farella, Braun & Martel, Jerome I. Braun, John L. Cooper, Robert S. Gottesman, San Francisco, Cal., for plaintiffs.

Godfrey L. Munter, Jr., Conrad D. Breece, Cotton, Seligman & Ray, Peter F. Sloss, San Francisco, Cal., for defendant.

## OPINION

ORRICK, District Judge.

Plaintiffs, eleven practicing dentists, bring this antitrust action on behalf of a class of all dentists in private practice in the State of California against defendant, California Dental Services (CDS), a nonprofit corporation engaged in the administration and operation of prepaid dental care programs. Plaintiffs contend that CDS has violated state and federal antitrust laws by conspiring with others to fix the fees charged by all dentists in the state for dental care by boycotting dentists who

refuse to restrict their fees in the manner suggested by CDS, and by monopolizing the California prepaid dental care market. *See* 15 U.S.C. §§ 1, 2, 3; Cal.Bus. & Prof.Code § 16700 *et seq.* The defendant asserts that it is entitled to summary judgment on the federal claims on the ground that the activities complained of are shielded from the application of federal antitrust law by the McCarran-Ferguson Act (the McCarran Act), 15 U.S.C. § 1011 *et seq.*

■ The McCarran Act confers upon those engaged in the business of insurance a specific exemption from federal antitrust legislation to the extent that such business is regulated by state law. 15 U.S.C. § 1012; 7 Von Kalinowski, *Antitrust Laws and Trade Regulations* § 47.02[1][a]. Thus, in addressing the instant motion, the Court must resolve two basic issues: first, are the activities complained of part of the "business of insurance" as that term is employed in the McCarran Act? And, second, if so, is such activity regulated under state law within the meaning of the McCarran Act? *Addrisi v. Equitable Life Assurance Society of U. S.*, 503 F.2d 725 (9th Cir. 1974), *cert. denied,* 420 U.S. 929, 95 S.Ct. 1129, 43 L.Ed.2d 400 (1975); *Mitgang v. Western Title Insurance Co.,* CCH Trade Reg.Rep. ¶ 75,322 (N.D.Cal.1974).

■ The parties differ markedly as to the approaches they urge the Court to adopt in determining what constitutes the "business of insurance" and what is sufficient state regulation for McCarran Act purposes. However, there is no dispute as to the underlying facts regarding the purposes, organization, and activities of CDS, nor its legal status under state law. Accordingly, the case is ripe for disposition by summary judgment.[1] *See Hycon Manufacturing Co. v. H. Koch & Sons,* 219 F.2d 353 (9th Cir. 1955), *cert. denied,* 349 U.S. 963, 75 S.Ct. 881, 99 L.Ed. 1278 (1955). For the reasons hereinafter stated, the Court holds that CDS is engaged in the business of insurance within the meaning of the McCarran Act, and that such business is regulated by state law in a manner sufficient to invoke the protection of the McCarran Act. Accordingly, the activities complained of are exempt from attack under the federal antitrust laws and the Court grants the defendant's motion for summary judgment.

## I

Defendant, CDS, is a nonprofit organization created pursuant to Section 9201 of the California Corporations Code.[2] It adminis-

---

1. This Court is, of course, aware of the *caveat* expressed time after time by the Supreme Court against the use of summary judgments in complex antitrust cases. *Poller v. Columbia Broadcasting Systems, Inc.,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); *Norfolk Monument Co. v. Woodlawn Memorial Gardens, Inc.,* 394 U.S. 700, 89 S.Ct. 1391, 22 L.Ed.2d 658 (1969). The Court has also cautioned that immunity from the federal antitrust laws should not be lightly implied. *United States v. Philadelphia National Bank,* 374 U.S. 321, 348, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963).

However, summary judgment is an appropriate manner of resolving disputes concerning applications of the McCarran-Ferguson Act, 15 U.S.C. § 1011 *et seq.,* and courts have not been hesitant to apply it where appropriate. *See, e.g., Proctor v. State Farm Mutual Automobile Insurance Co.,* 406 F.Supp. 27 (D.D.C.1975); *Schwartz v. Commonwealth Land Title Insurance Co.,* 374 F.Supp. 564 (E.D.Pa.1974) (subsequent proceedings reported at 384 F.Supp. 302 (E.D.Pa.1974).

2. Section 9201 of the California Corporations Code provides:

"*Health service organizations: Requirements: Supervision.* A nonprofit corporation may be formed under this part for the purposes of defraying or assuming the cost of professional services (commencing with Section 500) of licentiates under any chapter of Division 2 of the Business and Professions Code or of rendering any such services, but it may not engage directly or indirectly in the performance of the corporate purposes or objects unless all of the following requirements are met:

(a) At least one-fourth of all licentiates of the particular profession residing in California become members.

(b) Membership in the corporation and an opportunity to render professional services upon a uniform basis are available to all licensed members of the particular profession.

(c) Voting by proxy and cumulative voting are prohibited.

ters prepaid dental care plans under agreements and contracts with various subscriber groups and subscribing purchasers. Pursuant to these contracts, the subscribing groups, which include government bodies, employer organizations, and joint employer-labor trust funds, pay periodic premiums to CDS in exchange for payment by CDS of professional fees for future dental services performed for individuals on whose behalf the premiums were paid.

The professional services are performed by practicing dentists who are classified by CDS as "participating" or "non-participating" dentists. Of the eleven named plaintiffs, six are classified as "participating" and five as "non-participating". Plaintiffs contend that in order to be a "participating" dentist, a practitioner must submit to CDS a schedule of the "Usual, Customary, and Reasonable" (UCR) fees charged to all patients and that these fees must be approved by CDS. Plaintiffs allege that CDS will approve a fee schedule only if the charges for designated procedures are below a certain level determined by CDS. This level is defined so as to preclude charges higher than what is charged by ninety percent of the dentists in the same area for any particular procedure (the so-called 90th percentile), unless a peer review group determines that a higher charge is appropriate under the circumstances. Moreover, to qualify as "participating", a dentist must agree to look solely to CDS for payment for dental care and services performed on CDS-covered patients and must agree not to charge the "CDS patient" the difference between the CDS approved charge and the fee which the dentist would charge without the restrictions imposed by CDS. If a dentist does not agree to limit his charges to those in the usual, customary, and reasonable range, plaintiffs contend that he is classified an "non-participating".

According to the plaintiffs, when a participating dentist performs services on pa-tients covered under a CDS dental care program, the patient receives full benefits from the CDS program under which he is covered. However, when a CDS-covered patient seeks care from a non-participating dentist, the patient receives less than full benefits from CDS. Plaintiffs charge that this has the effect of excluding non-participating dentists from the CDS market since a CDS patient who seeks services from a non-participating dentist suffers a financial detriment.

Plaintiffs assert that CDS controlled one-third of all payments made to dentists in California in 1974 and that over ninety-five percent of the practicing dentists in the state were participating members of CDS at that time.

The complaint alleges violations of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3, charging CDS with conspiring with purchasers of prepaid dental plans to suppress and restrict the fees which dentists may charge for dental care and services. Plaintiffs further allege CDS violated Section 2 of the Sherman Act, 15 U.S.C. § 2, by monopolizing the prepaid dental care market. Plaintiffs also allege a conspiracy between CDS and subscribing purchasers to boycott dentists who refuse to limit and restrict their fees to the level dictated by CDS. This boycott is allegedly carried out by referring CDS-covered patients only to participating dentists. Plaintiffs also assert pendent state law claims.

II

CDS asserts that it is insulated from antitrust attack by the McCarran Act, enacted by Congress in 1945. Until 1944, insurance contracts were deemed outside the purview of federal legislation regulating interstate commerce. See, e.g., Paul v. Virginia, 75 U.S. (8 Wall.) 168, 19 L.Ed. 357 (1869). Consequently, insurance transactions were considered to be subject to the regulation of

(d) A certificate is issued to the corporation by the particular professional board whose licentiates have become members, finding compliance with the requirements of subdivisions (a), (b), and (c).

Any such nonprofit corporation shall be subject to supervision by the particular professional board under which its members are licensed and shall also be subject to Section 9505."

the states exclusively. However, in the landmark decision in *United States v. Southeast Underwriters Ass'n*, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944), the Supreme Court overruled earlier precedent and held that the business of insurance was subject to federal regulation under the Commerce Clause, and hence was subject to the federal antitrust laws. Concerned over the potentially chaotic effect of federal intrusion into an area which had traditionally been left to state control, Congress reacted with the passage of the McCarran Act. *See* 91 Cong.Rec. 483–488, 1085–1093, 1481 (1945); 7 Von Kalinowski, *Antitrust Laws and Trade Regulation* § 47.01[2].

■ The McCarran Act expressed the Congressional declaration that "the continued regulation and taxation by the several States of the business of insurance is in the public interest * * *." 15 U.S.C. § 1011. Congress' broad purpose in enacting the McCarran Act was to "give support to the existing and future state systems for regulating and taxing the business of insurance". *Prudential Insurance Co. v. Benjamin*, 328 U.S. 408, 429–430, 66 S.Ct. 1142, 1155, 90 L.Ed. 1342 (1946). The McCarran Act was a compromise measure between those who supported a complete exemption from the antitrust laws for the insurance industry and those who favored no immunity whatsoever. 7 Von Kalinowski, *Antitrust Laws and Trade Regulation* § 47.01[2]. Thus, the operative section of the McCarran Act provides in pertinent part: [3]

"(a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

3. The McCarran-Ferguson Act, 15 U.S.C. § 1011 *et seq.*, preserved federal jurisdiction over certain predatory conduct regardless of whether such activity is also subject to state regulation. Thus, Section 1013(b) of the Act provides:

"Nothing contained in this chapter shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation."

"(b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance * * * unless such Act specifically relates to the business of insurance: *Provided*, That * * * the Sherman Act, and * * * the Clayton Act * * * shall be applicable to the business of insurance to the extent that such business is not regulated by State law." 15 U.S.C. § 1012.

Thus, in determining whether the CDS may properly invoke the McCarran Act to escape scrutiny of its activities under the Sherman Act, the Court must decide whether such activity is regulated by state law. *Addrisi v. Equitable Life Assurance Society of the U. S., supra; Schwartz v. Commonwealth Land Title Insurance Co.*, 374 F.Supp. 564 (E.D.Pa.1974).

### A

The critical definitional dispute between the parties involves the issue of how to determine what constitutes the "business of insurance". The outcome of the case turns on this definitional controversy.

Plaintiffs insist that the "business of insurance" as that term is used in the McCarran Act is to be defined by those state statutes which were enacted for the purpose of regulating the business of insurance. Simply stated, plaintiffs assert that CDS can only be engaged in the business of insurance if the State of California deems it to be an insurance company, subject to regulation under the California Insurance Code.

■ In plaintiffs' view, the Court need not make further inquiry since it is undis-

However, this boycott exception has been construed very narrowly to apply only to company "blacklisting" efforts. *Addrisi v. Equitable Life Assurance Society of the U. S.*, 503 F.2d 725 (9th Cir. 1974), *cert. denied*, 420 U.S. 929, 95 S.Ct. 1129, 43 L.Ed.2d 400 (1975). Plaintiffs concede this provision is inapposite in this case.

puted that CDS is not licensed by the Department of Insurance of the State of California to transact insurance business and is not regulated under the California Insurance Code.[4]

Rather, CDS is considered under state law to be a health care service plan formerly subject to regulation pursuant to the provisions of the Knox-Mills Health Plan Act, Cal.Govt.Code § 12530 *et seq.*, recently repealed, and now regulated by the Knox-Keene Health Care Service Plan Act of 1975, Chapter 941 of the California Laws of 1975, Cal.Health & Saf.Code § 1340 *et seq.*, effective July 1, 1976. Such a health service plan is not an "insurer" under state law. *People v. California Mutual Ass'n*, 68 Cal.2d 677, 68 Cal.Rptr. 585, 441 P.2d 97 (1969).

▮ Therefore, plaintiffs suggest that the application of the federal antitrust laws to CDS will not impair, invalidate, or supersede any state law enacted for the purpose of regulating the business of insurance and, hence, the McCarran Act exemption is not triggered. The Court disagrees.[5]

▮ The interpretation of what constitutes the "business of insurance" as that term is used in the McCarran Act is a federal question and federal interpretations supersede those of state courts. *SEC v.*

*Variable Annuity Life Insurance Co.*, 359 U.S. 65, 69, 79 S.Ct. 618, 3 L.Ed.2d 640 (1959); *Fry v. John Hancock Mutual Life Insurance Co.*, 355 F.Supp. 1151, 1154 (N.D. Tex.1973). Whether something is, in fact, "insurance" is a question that is to be decided solely by the federal courts since they alone decide whether the McCarran Act is applicable. 7 Von Kalinowski, *Antitrust Laws and Trade Regulation* ¶ 47.02[2][b] at 47–32.

The Supreme Court's decision in *SEC v. Variable Annuity Life Insurance Co.*, supra, settles this issue. That case involved an action instituted by the Securities and Exchange Commission to enjoin insurance companies from offering variable annuity contracts to the public without compliance with certain requirements of federal securities and investment regulation laws. The companies insisted that the issuance of the annuity contracts constituted part of the business of insurance and was, therefore, protected from further federal regulation. Discussing the meaning of the term "insurance" in regard to federal securities acts *and* the McCarran Act, the Court stated:

"We deal, however, with federal statutes where the words 'insurance' and 'annuity' are federal terms. Congress was legislating concerning a concept which

4. Certificate of Wesley J. Kinder, Insurance Commissioner of the State of California.

5. Plaintiffs' suggested approach was recently adopted in *Pastor v. Hartford Fire Insurance Co.*, CCH Trade Reg.Rep. ¶ 60,783 (C.D.Cal. 1976). It involved an alleged conspiracy to restrain trade in medicine and physicians' liability insurance between the Los Angeles County Medical Association and certain insurance companies. The court granted Hartford's motion to dismiss based on the McCarran-Ferguson Act (McCarran Act), ruling that the activities complained of were embraced within the state definition of insurance and were subject to state regulation. However, the court refused to dismiss the action as against the County Medical Association solely because it was not engaged in the business of insurance and the power of the state insurance commissioner did not extend to it. The court stated:

"* * * The Court considers the proper definition of 'the business of insurance,' as that term is used in the McCarran-Ferguson Act, is to be found by considering the partic-

ular plan to regulate insurance under the state statute where the question arises. In other words, our question is whether the activities here complained of are within the reach of the regulatory provisions of the California Insurance Code. What is regulated by that code is the business of insurance." *Id.* at 68,397.

This Court declines to follow *Pastor* for several reasons. First, as is discussed *infra*, the Court believes that the business of insurance should be defined by reference to *federal*, not state, law. Moreover, the Los Angeles County Medical Association is distinct in organization and function from the defendant herein, a nonprofit health service organization. Finally, the exemption provided in the McCarran Act is not strictly limited to insurance companies; it is the "business of insurance" with which the McCarran Act is concerned. Thus, the focus must be on the nature of the conduct involved, not the status of the defendant under state law. *Royal Drug Co. v. Group Life & Health Insurance Co.*, 415 F.Supp. 343 (W.D.Tex.1976).

had taken on its coloration and meaning largely from state law, from state practice, from state usage. Some States deny these 'annuity' contracts any status as 'insurance.' Others accept them under their 'insurance' statutes. It is apparent that there is no uniformity in the rulings of the States on the nature of these 'annuity' contracts. In any event how the States may have ruled is not decisive. For, as we have said, the meaning of 'insurance' or 'annuity' under these Federal Acts is a federal question." (Footnotes omitted.) 359 U.S. at 69, 79 S.Ct. at 621.

Plaintiffs correctly point out that in *Variable Annuity*, the Court held that the issuance of the variable annuity contracts did *not* constitute the business of insurance and, therefore, was subject to further federal regulation. However, this is a distinction without a difference for the present purposes, for in so doing, the Court applied a federal definition to the "business of insurance".[6]

The Court in *Variable Annuity* defined the "business of insurance" in the broad sense as the underwriting of risks in exchange for a premium. *SEC v. Variable Annuity Life Insurance Co., supra*, 359 U.S. at 71, 79 S.Ct. 618. The Court further elaborated on the meaning of the term ten years later in *SEC v. National Securities, Inc.*, 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969). There, the McCarran Act exemption was raised as a defense to an action challenging the merger of two insurance companies. The Court found the exemption inapposite since it determined that the applicable state regulation was directed

at the company-shareholder relationship, not the relationship between the company and its policyholders. In defining the reach of the McCarran Act exemption, the Court stated that the fixing of rates and ratemaking, the selling and advertising of policies, and the licensing of agents and companies, certainly constituted part of the "business of insurance". The Court went on to explain:

"* * * Congress was concerned with the type of state regulation that centers around the contract of insurance, the transaction which *Paul v. Virginia* held was not 'commerce.' The relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement—these were the core of the 'business of insurance.' Undoubtedly, other activities of insurance companies relate so closely to their status as reliable insurers that they to must be placed in the same class. But whatever the exact scope of the statutory term, it is clear where the focus was—it was on the relationship between the insurance company and the policyholder. Statutes aimed at protecting this relationship, directly or indirectly are laws regulating the 'business of insurance.'" 393 U.S. at 460, 89 S.Ct. at 568.

As noted, CDS is engaged in the business of operating prepaid dental care plans under which various subscribers pay periodic premiums in exchange for CDS' agreement to pay certain professional fees for dental care services performed on designated patients.[7] The uncontroverted affidavit of CDS' chief actuary indicates that in

---

**6.** *Mitgang v. Western Title Insurance Co.*, CCH Trade Reg.Rep. ¶ 75,322 (N.D.Cal.1974), further supports the proposition that the "business of insurance" is defined by reference to federal law. There the court held that title insurance was "insurance" for McCarran-Ferguson Act purposes by applying federal standards. The court noted that it was also "of interest, although hardly dispositive" that title insurance was regulated under the California Insurance Code. *Id.* at 98,025.

**7.** Plaintiffs' definition of CDS' business, as set forth in the complaint, is:

"18. *Prepaid dental care plans* are contracts between CDS, dental service corporations, or other providers of dental health care insurance and subscribing purchasers for the benefit of designated groups of patients, whereby, in exchange for periodic premiums and consideration received by CDS or other providers from subscribing purchasers, CDS or other providers agree to pay certain professional fees and charges for dental care and services performed on and for designated patients." Complaint, pp. 4–5.

contracting to provide prepaid dental care plans, CDS underwrites the actuarial risk that the premium payments by the contracting group will be sufficient to defray the costs of dental care services which CDS undertakes to provide. The method by which the premiums for CDS dental care programs is fixed is generally the same as that used by actuaries for all health insurance premium calculations.[8]

In this litigation, plaintiffs' primary challenge is directed at the method and manner by which CDS compensates those dentists who provide the services for which CDS accepts claims and underwrites risks. As noted, CDS obligates itself to limit its payments to service providers (dentists) by means of the UCR fee method of payment, measured by comparison with the 90th percentile for all of the dentist's competitors in a given geographic area of practice. In return for payment by CDS, CDS requires the dentist to refrain from seeking excess remuneration from CDS' insureds.

Lower federal courts which have considered the applicability of the McCarran Act to similar prepaid health care plans have uniformly held that such plans constitute part of the "business of insurance". This Court follows these precedents in holding that CDS is engaged in the "business of insurance" for McCarran Act purposes.

Strikingly similar to the instant case is the recent decision in *Anderson v. Medical Service of the District of Columbia*, Civ. No. 73–470–A (E.D.Va., Feb. 10, 1976). This was an antitrust action by a physician against a prepaid medical-surgical insurance plan in the Washington, D. C. area challenging the UCR fee method of compensation. As here, the plan distinguished

between participating and non-participating service providers (physicians rather than dentists) in regard to reimbursement methods. The Court held that the defendant's reimbursement methods, including its UCR method of payment to service providers, constituted part of the business of insurance exempt from the federal antitrust laws under the McCarran Act. The court also held that the challenged practices were subject to state regulation by the State Corporation Commission—Bureau of Insurance, and that this regulation was sufficient to trigger the McCarran Act exemption even though it appears that the regulatory provisions are not found in the Insurance Code, but in Title 32, entitled "Health".

Also in point is the leading case of *Travelers Insurance Co. v. Blue Cross*, 481 F.2d 80 (3d Cir. 1973), *cert. denied*, 414 U.S. 1093, 94 S.Ct. 724, 38 L.Ed.2d 550 (1973). There a commercial insurance company brought an antitrust action against the defendant, a nonprofit provider of prepaid medical health care organized under the state Non-Profit Hospital Plan Act, 40 Pa.Stats. § 1401 *et seq.* At issue was the validity of the standard contract which Blue Cross had with 101 hospitals which prescribed the amounts and terms under which Blue Cross paid for the services rendered by the hospitals to its subscribers. As here, if the service provider (the hospital) did not agree to Blue Cross' terms and conditions, including ceiling prices for certain procedures, Blue Cross would reimburse the hospital in a less advantageous manner. 481 F.2d at 82 n. 12. The court examined the challenged contracts and concluded that the interrelationship between hospital payments and subscribers' costs was such that Blue Cross'

**8.** Page 2 of the affidavit of Guy F. Chetalat, filed in support of CDS' motion for summary judgment, indicates:

"The principal business of California Dental Service is to contract with government bodies, employer organizations and joint employer-labor trust funds to provide dental care benefits for members of groups in exchange for fixed, per capita, monthly premium payments by the contracting entity. In entering into such contracts, CDS assumes the actuarial risk that the monthly, per capita premium payments by the contracting group will be sufficient to defray the costs of the benefits which CDS undertakes to provide. It is my responsibility as actuary for CDS to estimate the expenses which CDS will incur in providing these benefits in order to arrive at an adequate premium rate to cover these expenses.

The method by which these expenses are estimated is generally the same as that used by actuaries for all health insurance premium calculations."

arrangement with the hospitals should be considered to be part of the "business of insurance" within the meaning of the McCarran Act. The court went on to hold that the challenged conduct was shielded from antitrust attack by the McCarran Act.

Similarly, in *Nankin Hospital v. Michigan Hospital Service*, 361 F.Supp. 1199, 1211 (E.D.Mich.1973), the court held that "The basic function of Blue Cross of providing prepaid hospital care is clearly 'the business of insurance.'" [9] *See also Winters v. Kansas Hospital Service Ass'n*, CCH Trade Reg. Rep. ¶ 60,140 (D.Kan.1975).

■ These authorities, and other applicable precedents, further reveal that the "business of insurance" may embrace arrangements between insurance companies and nonpolicyholders, including service providers. Thus, an alleged agreement between insurance companies and claims adjusters to pay only the prevailing rates for parts and services to automobile repair shops in the adjustment of damage claims was held to be part of the "business of insurance". *Proctor v. State Farm Mutual Insurance Co.*, 406 F.Supp. 27 (D.D.C.1975). In *Schwartz v. Commonwealth Land Title Insurance Co.*, supra, the court determined that a fee charged to a seller of real property by title insurance companies constituted part of the business of insurance even though the purchaser of the property was the policyholder. In the very recent case of *Royal Drug Co. v. Group Life & Health Insurance Co.*, 415 F.Supp. 343 (W.D.Tex. 1976), the court held that agreements be-

tween Blue Shield and participating pharmacies under which Blue Shield's insureds received prescription drugs at a reduced rate constituted part of the "business of insurance". Finally, in *California League of Independent Insurance Producers v. Aetna Casualty & Surety Co.*, 175 F.Supp. 857 (N.D.Cal.1959), the court ruled that the "business of insurance" included an alleged conspiracy to fix the price of insurance agents' fees.

■ The teaching of these cases is that the protection afforded by the McCarran Act is not strictly limited to insurance companies. The McCarran Act is concerned with the "business of insurance", and thus it is the nature of the challenged conduct which must be examined in determining whether the exemption applies. *Royal Drug Co. v. Group Life & Health Insurance Co.*, supra. The authorities further reflect the fact that a wide variety of activities which have a substantial effect on ratemaking, including the settlement of claims and the limitations of costs, are embraced within the definition of "business of insurance". *Travelers Insurance Co. v. Blue Cross*, supra, 481 F.2d at 83; *Proctor v. State Farm Mutual Insurance Co.*, supra, 406 F.Supp. at 29.

■ Plaintiffs here contend that it is an antitrust violation for CDS to pay service providers prevailing rates for the services rendered to insured patients. It is undisputed that the level of dentists' fees are a major factor in determining policy premiums.[10] CDS' payment arrangements to

---

**9.** Plaintiffs suggest that no federal case considering the reach of the term "business of insurance" has created "insurance" where the state did not consider "insurance" to exist. The Court cannot accept this flat assertion. In *Nankin Hospital v. Michigan Hospital Service*, 361 F.Supp. 1199 (E.D.Mich.1973), the district court determined that the defendant (the Michigan Blue Cross Plan) was in the "business of insurance". However, in the case of *Michigan Hospital Service v. Sharpe*, 339 Mich. 357, 63 N.W.2d 638 (1954), the Michigan Supreme Court held that the same entity, Michigan Hospital Service, was *not* an insurance company, but rather was engaged in the business of providing health care. The state case was not cited in *Nankin*.

In *Commander Leasing Co. v. Transamerica Title Insurance Co.*, 477 F.2d 77, 83 (10th Cir. 1973), the court noted that certain of the defendants, domestic land title insurance companies, were formerly subject to regulation by the State Bank Commissioner. This fact was not considered determinative in deciding whether the companies were engaged in the business of insurance.

**10.** Page 3 of the uncontroverted affidavit of Guy F. Chetalat, filed in support of CDS' motion for summary judgment, states:

"To determine a premium rate, the estimated cost of administration of the program provided for by the contract and an amount to compensate CDS for its assumption of the

service providers are critical elements in CDS' contractual agreements with its subscribers. These arrangements are intimately related to the interpretation and implementation of CDS' policies and to its reliability as an insurer. Accordingly, the Court finds that the activities challenged in the instant complaint constitute part of the "business of insurance" within the meaning of the McCarran Act.[11]

**B**

██ In addition to requiring that the practice in question constitute the "business of insurance", the McCarran Act further requires that the challenged conduct be regulated under state law. It should be noted that the concept of state regulation for McCarran Act purposes is one of considerable breadth. As one court noted:

"The McCarron [sic] Act renders the federal antitrust laws inapplicable when state legislation generally proscribes, permits or otherwise regulates the conduct in question and authorizes enforcement through a scheme of administrative supervision." *Crawford v. American Title Insurance Co.*, 518 F.2d 217, 218 (5th Cir. 1975).

*See also California League of Independent Insurance Producers v. Aetna Casualty & Surety Co.*, *supra*, 175 F.Supp. at 860.

██ The state regulatory scheme need not seek to implement the policies expressed in the federal antitrust laws. 7 Von Kalinowski, *Antitrust Laws and Trade Regulations* ¶ 47.02[2][a]. Thus, the McCarran Act exemption is not affected by whether there is a conflict between the federal antitrust laws and the state regulation. *Proctor v. State Farm Mutual Auto Insurance Co.*, *supra*, 406 F.Supp. at 30. Nor does the exemption turn on whether the state scheme is effective either in the sense that it is actually being enforced or that a better scheme might have been enacted. *Travelers Insurance Co. v. Blue Cross*, *supra*, 481 F.2d at 83; 7 Von Kalinowski, *Antitrust Laws and Trade Regulations* ¶ 47.02[2][a] at 47–22. Indeed, the mere existence of regulatory statutes capable of being enforced is sufficient to invoke the protection of the McCarran Act. *Commander Leasing Co. v. Transamerica Title Insurance Co.*, 477 F.2d 77, 84 (10th Cir. 1973); *Proctor v. State Farm Mutual Insurance Co.*, *supra*, 406 F.Supp. at 30.

Thus, a wide range of state statutes capable of application to insurance transactions have been held to be sufficient state regulation to invoke the McCarran Act. Statutes prohibiting unfair practices or unfair competition in the insurance industry have been deemed sufficient, even where such statutes do not specifically proscribe rate-fixing. *See, e. g., Crawford v. American Title Insurance Co.*, *supra*; *Commander Leasing Co. v. Transamerica Title Insurance Co.*, *supra*; *Schwartz v. Commonwealth Land*

---

risk of contracting to provide benefits for a fixed premium are added to the estimated cost of paying claims for benefits. * * * The volume of dental services and the level of dentists' fees are the major variable factors which determine [the policy premium] * * *."

11. It is clear that the McCarran-Ferguson Act (McCarran Act) does not extend protection from the antitrust laws to *all* activities of insurance companies. *SEC v. National Securities, Inc.*, 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969); *Center Insurance Agency, Inc. v. Byers*, CCH Trade Reg.Rep. ¶ 60,940 (N.D.Ill.1976); *Hill v. National Auto Glass Co.*, CCH Trade Reg.Rep. ¶ 73,594 (N.D.Cal.1971). However, in light of the above-discussed cases, this Court cannot accept plaintiffs' suggestion that the McCarran Act does not apply where an insurance company has allegedly conspired with noninsurance defendants to violate the federal antitrust laws. *Center Insurance* and *Hill* are inapposite to the case at bar since here the challenged conduct has a substantial effect on rates and does not involve predatory practices.

*Hill* involved an alleged conspiracy between insurance companies and an automobile glass shop franchiser to fix prices, allocate business, and boycott competitors. Subsequent courts have interpreted *Hill* as applying to situations where the impact of the alleged anticompetitive activity on the rate-making structure of the insurer is insubstantial or tangential. *Travelers Insurance Co. v. Blue Cross*, 481 F.2d 80, 83 (3d Cir. 1973), *cert. denied*, 414 U.S. 1093, 94 S.Ct. 724, 38 L.Ed.2d 550 (1973).

*Center Insurance* involved an alleged conspiracy to pirate trade secrets and other confidential information. No such claim is alleged here.

*Title Insurance Co., supra; Harrison v. Chicago Title Insurance Co.,* CCH Trade Reg. Rep. ¶ 75,321 (D.Kan.1974); *Mitgang v. Western Title Insurance Co., supra.* State antitrust laws applicable to insurance companies have also been considered to trigger the McCarran Act exemption. *See, e. g., Mitgang v. Western Title Insurance Co., supra; California League of Independent Insurance Producers v. Aetna Casualty & Surety Co., supra; Winters v. Kansas Hospital Service Ass'n, supra.*

■ CDS asserts that its activities are subject to extensive state regulation and, hence, the McCarran Act exemption should apply. Specifically, CDS points to California's antitrust law, the Cartwright Act, Cal. Bus. & Prof.Code § 16700, *et seq.*, the Knox-Mills Health Plan Act, Cal.Govt.Code § 12530, *et seq.*, and the provisions of the California Corporations Code governing nonprofit professional service corporations. Cal.Corp.Code § 9201.

The Knox-Mills Act subjected CDS to a comprehensive scheme of state regulation under the supervision of the State Attorney General. The Act required health care service plans such as CDS to register annually with the Attorney General and to file copies of contracts between CDS and subscribers and between CDS and service providers. Cal.Govt.Code §§ 12537-8, 12538.1, 12539.6. Both the contracts with subscribers and those with service providers contain the 90th percentile fee arrangements at issue here. The health care service plan was required to contract with service providers "to provide health care services for a [specific] consideration" or to maintain either cash reserves or reinsurance. Cal.Govt. Code § 12539.1. The law further imposed financial requirements and mandated certain financial accounting methods and reporting. Cal.Govt.Code §§ 12539, 12539.1, 12539.3–12539.5, 12538.6–12538.8. Further provisions regulated advertising, solicitation, and disclosure of information to subscribers. Cal.Govt.Code §§ 12531, 12532, 12537. Moreover, it authorized the Attorney General to issue cease-and-desist orders remedying violations of its provisions and to bring proceedings for injunctive relief. Cal.Govt.Code §§ 12534, 12535.

In 1975, the California Legislature repealed the Knox-Mills Health Plan Act and replaced it with the Knox-Keene Health Care Service Plan Act, Cal.Stats.1975, Chap. 941, Cal.Health & Saf.Code § 1340 *et seq.*, effective July 1, 1976. The regulation features of the old act discussed above were incorporated into the new legislation, which also added other requirements pertinent here.

Section 1342 of the California Health and Safety Code contains a statement of the purposes of the new legislation, including, among other things:

"(d) Help assure the best possible health care for the public at the lowest possible cost by transferring the financial risk of health care from the patient to the providers.

\* \* \* \* \* \*

(f) Assuring the financial stability thereof by means of proper regulatory procedures."

All health care service plans are required to be licensed by the Commissioner of Corporations. Cal.Health & Saf.Code § 1340 *et seq.* Upon filing an application for a license, a plan must submit a copy of its contracts with providers of health care services and copies of its contracts with subscribers. Cal.Health & Saf.Code § 1351. Upon modification of any material information in its application for a license, a plan is required to file an amendment and obtain the approval of the Commissioner. Cal. Health & Saf.Code § 1352.

Among the standards for obtaining a license is the requirement that:

"\* \* \* all contracts with subscribers and enrollees, including group contracts, and all contracts with providers \* \* \* shall be fair, reasonable and consistent with the objectives of this chapter." Cal.Health & Saf.Code § 1367(h).

The plan must demonstrate that it is financially responsible. In connection with

this the Commissioner is directed to consider the following matters:

"(1) The financial soundness of the plan's arrangements for health care services and a schedule of rates and charges adopted by the plan.

\* \* \* \* \* \*

(3) Agreements with providers \* \* for the provision of health care services." [12] Cal.Health & Saf.Code § 1372.

The scheme of state regulation of CDS is similar to statutory schemes considered sufficient to invoke the protections of the McCarran Act in other cases. *See, e. g., Travelers Insurance Co. v. Blue Cross, supra; Nankin Hospital v. Michigan Hospital Service, supra.* Accordingly, the Court finds that such a state regulatory scheme is sufficient here to constitute regulation within the meaning of the McCarran Act.[13]

▆▆▆▆ CDS also claims that its exposure under the state antitrust laws triggers the McCarran Act exemption. There is ample support for the proposition that a state antitrust law constitutes sufficient state regulation within the meaning of the McCarran Act. *California League of Independent Insurance Producers v. Aetna Casualty & Surety Co., supra; Mitgang v. Western Title Insurance Co., supra; see also Meicler v. Aetna Casualty & Surety Co.,* 506 F.2d 732 (5th Cir. 1975); *Winters v. Kansas Hospital Service Ass'n, supra.* Thus, the potential exposure of CDS to a claim under the Cartwright Act, Cal.Bus. & Prof.Code § 16700 *et seq.,* also constitutes sufficient state regulation as required by the McCarran Act.[14]

**12.** Plaintiffs contended that the activities of CDS challenged in the complaint were not subject to state regulation since the Knox-Mills Act did not provide for rate regulation. *See* Cal.Govt.Code § 12536(d). It appears that the newly enacted Knox-Keene Health Care Service Plan Act, Cal.Health & Saf.Code § 1340, *et seq.,* does set forth a scheme of such regulation. This newly enacted scheme is certainly relevant in determining whether the activities of CDS are subject to state regulation. *Mitgang v. Western Title Insurance Co.,* CCH Trade Reg.Rep. ¶ 75,322 (N.D.Cal.1974). There the court noted:

"Additionally, rates for title insurance are now regulated by California law. In their complaint, plaintiffs had alleged that there was no state regulation, but, as plaintiffs have themselves pointed out to the Court (and the Court takes judicial notice), effective January 1, 1974, Insurance Code § 12401 *et seq.* does in fact set forth a scheme of rate regulation." *Id.* at 98,026.

**13.** Plaintiffs' argument boils down to the simple proposition that the McCarran Act is inapposite because CDS is not regarded as an "insurer" under state law. It is interesting to note that both the state legislature and the state courts have recognized substantial similarities between health care service plans like CDS and "insurers".

In *People v. California Mutual Ass'n,* 68 Cal.2d 677, 68 Cal.Rptr. 585, 441 P.2d 97 (1968), the California Supreme Court was presented with the issue of whether a Knox-Mills health care service plan was subject to the supervision of the Insurance Commissioner. If so, the plan would be required to comply with the financial responsibility provisions of the Insurance Code, including the maintenance of paid-in capital and surplus, and the payment of premium taxes. The court conceded a health plan was similar to insurance; however, it further recognized that the direct service feature of such a plan warranted special treatment of health plans. Swayed by the policy consideration that a requirement of financial reserves for a service plan would be "a useless and uneconomic waste", the court held that such a plan was not an insurer.

The state legislature has also recognized the similarity between health care service plans and other health insurance programs. *See* 1963 Assembly Interim Committee on Finance and Insurance Report on "Pre-paid Health Plans" at 28. Recent legislation requiring full disclosure of health insurance policy information applied to health care service plans, as well as "insurers" under state law. Cal.Stats. 1974, Chap. 936, amending the Knox-Mills Act, Cal.Govt.Code §§ 12537.1–12537.3, and the California Insurance Code Sections 10600 to 10608.

**14.** In a prior motion to dismiss in this action, CDS asserted that the conduct challenged in the complaint was not subject to antitrust attack under the Cartwright Act, Cal.Bus. & Prof. Code § 16700 *et seq.,* because of a "learned profession" exception to the state antitrust laws. *Willis v. Santa Ana Community Hospital Ass'n,* 58 Cal.2d 806, 26 Cal.Rptr. 640, 376 P.2d 568 (1962). The continued vitality of this exception after the recent Supreme Court decision in *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), is a matter which should most appropriately be decided by a state court. This, of course, militates against retention of the pendent state

## III

As discussed above, the Court holds that the activities of CDS challenged in the instant complaint are insulated from attack under the federal antitrust laws by reason of the McCarran Act exemption. In this situation, the Court deems it appropriate to exercise its discretion to dismiss the pendent state claims. *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Royal Drug Co. v. Group Life & Health Insurance Co., supra.*

Accordingly, defendant's motion for summary judgment is GRANTED. Defendant shall submit a proposed form of judgment approved as to form by plaintiff, on or before November 18, 1976.

claims. Moreover, this Court previously denied CDS' motion to dismiss the Cartwright

Act claim, and CDS has accepted this as the "law of the case".