**ROYAL DRUG COMPANY, INC., d/b/a Royal Pharmacy of Castle Hills and Disco Prescription Pharmacy, et al., Plaintiffs-Appellants,**

**v.**

**GROUP LIFE AND HEALTH INS. CO., a/k/a Blue Shield and/or Blue Cross-Blue Shield of Texas, et al., Defendants-Appellees.**

No. 76–2746.

United States Court of Appeals,
Fifth Circuit.

Aug. 8, 1977.

Rehearing and Rehearing En Banc
Denied Oct. 27, 1977.

Joel H. Pullen, Stephen F. Lazor, San Antonio, Tex., for plaintiffs-appellants.

Keith E. Kaiser, R. Laurence Macon, J. Burleson Smith, San Antonio, Tex., for Group Life & Health.

William C. Church, Jr., San Antonio, Tex., for Walgreen Texas Co.

Richard B. Moore, San Antonio, Tex., for Sommers Drug Stores Co.

Charles R. Shaddox, San Antonio, Tex., for Rieger-Medi-Save Pharmacies, Inc.

Before GOLDBERG and HILL, Circuit Judges, and KERR,* District Judge.

JAMES C. HILL, Circuit Judge:

The plaintiffs in this civil antitrust action are eighteen independent pharmacy owners doing business in San Antonio, Texas.[1] Blue Shield is a Texas insurance company authorized by the State Board of Insurance of Texas to sell life, health and accident insurance. Three other defendants, Walgreen Texas Company, The Sommers Drug Stores Company and Rieger Medi-Save Pharmacies, Inc., also operate pharmacies in San Antonio, Texas.

The plaintiffs contend that the defendants have violated Section 1 of the Sherman Act, 15 U.S.C. § 1, by agreeing, combining and conspiring to fix the retail price of drugs and pharmaceuticals, and that the activities of the defendants have caused Blue Shield's insureds not to deal with certain of the plaintiffs, thereby constituting an unlawful group boycott. Plaintiffs also allege violations of Texas antitrust law over which the district court took pendent jurisdiction. The defendants affirmatively alleged in their answers that pursuant to the provisions of the McCarran-Ferguson Act,

15 U.S.C. § 1011, et seq., ("McCarran Act") the complaint failed to state a claim upon which relief could be granted and that the district court lacked subject matter jurisdiction. On the basis of the McCarran Act, each defendant moved to dismiss the complaint pursuant to Rule 12(b), F.R.Civ.P. The defendants also moved that the court treat their motions as motions for summary judgment pursuant to Rule 56, F.R.Civ.P. Defendants further moved the court to dismiss the claims based upon state law if the court found there was not a proper cause of action based upon federal law. The district court held that: (1) the conduct complained of by the plaintiffs constitutes the business of insurance; (2) the State of Texas has regulated and is actively regulating such business of insurance within the meaning of the McCarran Act; (3) that the boycott exception to the McCarran Act is inapplicable to the instant case; and (4) that the federal antitrust laws are, therefore, rendered inapplicable. We reverse.

## I. The Facts.

Plaintiffs are challenging a plan of operation under which Blue Shield issues certain prescription drug insurance policies which entitle Blue Shield's insureds to purchase drugs from any pharmacy. If the pharmacy selected by the policyholder has entered into a written contract ("Pharmacy Agreement") with Blue Shield, the insured is required to pay only two dollars ($2.00), the amount of the drug deductible set forth in the policy. On the other hand, if the insured has his prescription filled by a pharmacy other than a Participating Pharmacy, he is required to pay the full price charged by the pharmacy, as well as the $2.00 deductible, and then to apply to Blue Shield for reimbursement. Blue Shield will then

---

* Senior District Judge for the District of Wyoming, sitting by designation.

1. Since the parties have been referred to in the briefs as plaintiffs and defendants, as they were in the district court, they will be so designated in this opinion. The defendant Group Life & Health Insurance Company will be referred to herein as Blue Shield.

reimburse the insured only for 75 percent of the usual and customary charge for the drug, less the $2.00 deductible.[2]

In 1969, Blue Shield sought approval from the Texas State Board of Insurance to begin issuing prescription drug insurance coverage. The Commissioner, however, disapproved the issuance or use of such a policy. The policy remained under the consideration of the Commissioner and in September, 1969, the Commissioner issued an order exempting the policy from the approval requirements of Texas law. The defendants contend that there is uncontradicted evidence showing that an exemption order exempts the policy from nothing more than the requirement of approval by the State Board of Insurance, and that exempted policies, as well as approved policies, are subject to all statutory requirements of the Texas Insurance Code and the continuing regulation, control and supervision of the State Board of Insurance.

When the Commissioner issued his orders concerning the plan, disapproving it in the first instance, and then exempting the plan, he advised the Texas Attorney General in writing of his actions on each occasion. After receiving the exemption order, Blue Shield made a statewide mailing to licensed pharmacies offering them the privilege of entering into the Pharmacy Agreement. As a result, Blue Shield has issued the policy to various groups and has entered into the Pharmacy Agreement with pharmacies throughout the State of Texas.

In 1974, Blue Shield entered into a health care agreement, which included prescription drug insurance, to provide insurance benefits to groups in Bexar County, Texas. In order to implement this agreement, in September, 1974, a policy form virtually identical to the one submitted in 1969 was filed with the State Board of Insurance for approval prior to its issuance or use. This policy was approved in October, 1974. Subsequently, Blue Shield has issued the policy to various groups in Bexar County and has offered to virtually all licensed pharmacies in San Antonio the opportunity of entering into the Pharmacy Agreement. Nine of the plaintiffs in this case accepted Blue Shield's offer and now operate Participating Pharmacies. In recent years, the number of pharmaceutical sales covered by this policy have risen dramatically. For example, between early 1972 and October, 1975, there was a 3,100 percent increase in the number of pharmaceutical claims processed by Blue Shield under the policy. In October, 1975, Blue Shield was handling these claims at the rate of approximately 31,000 claims per month as compared with only 1,000 claims per month in early 1972.

For each sale made under the plan, a Participating Pharmacy is limited to a $2.00 markup, which is known as a "professional dispensing fee," irrespective of its actual acquisition cost for a particular drug. The plaintiffs note that, with respect to highly expensive drugs, the Pharmacy Agreement can result in a markup of no more than two percent, which will not even cover the interest on its investment in inventory.

## II. Summary of Contentions on Appeal.

The plaintiffs argue that the retail sales price, as fixed in the Pharmacy Agreement between Blue Shield and the defendant pharmacy chains, has been set at a level below that at which small independent pharmacies can profitably conduct business. They claim that only large, high volume chains that sell many items in addition to drugs can afford to operate pursuant to the Pharmacy Agreement. They also contend that the Agreement fixes the retail price of drugs at a level which eliminates the only effective means by which small independent pharmacies can compete with the large chains—the provision of services. They ar-

---

**2.** The usual and customary charge is established by Blue Shield and is determined by reference to its compilation of such charges.

gue that, since signatories of the Pharmacy Agreement are limited to the same retail sales price whether they provide home deliveries, twenty-four service, or no service at all, the ability of the independents to compete is effectively destroyed. The plaintiffs contend that Blue Shield's plan of operation not only encompasses the fixing of prices in the defendant pharmacy chains, but it extends to the pharmaceutical industry as a whole. They contend that small independent pharmacies are given the choice of either signing the price fixing agreement or being forced out of business.

The plaintiffs also argue that there are two types of coercion of Blue Shield's subscribers inherent in the plan. First, the subscriber receives markedly reduced benefits if he patronizes a pharmacy that refuses to sign the price-fixing agreement. Although he would pay only the $2.00 drug deductible for each prescription filled by a participating pharmacy, he would ultimately pay an amount representing 25 percent of a reasonable charge for the drug, in addition to the $2.00 drug deductible, for each prescription filled by a nonsigning pharmacy. The plaintiffs also point out that the differential in benefits between participating and nonparticipating pharmacies is intended to coerce Blue Shield's policy holders not to patronize nonsigning pharmacies *in Texas* and thereby to coerce such pharmacies to sign the price-fixing agreement. This allegation is based on the policy itself, which provides that the subscriber will be reimbursed 100 percent of a reasonable charge for the drug, less the $2.00 drug deductible, when he patronizes a nonsigning pharmacy outside the State of Texas.

The plaintiffs also contend that there is a second and more subtle step to the coercion. If a pharmacy signs the Pharmacy Agreement and agrees to charge only the stipulated amount for drugs sold to Blue Shield subscribers, it will be reimbursed directly by Blue Shield in the amount of the acquisi-

tion cost, and the subscriber will be obligated to pay the pharmacy at the time of purchase only the $2.00 drug deductible. If the pharmacy has refused to sign the Agreement, however, Blue Shield will not deal with the pharmacy directly, and the subscriber must pay the entire retail sales price at the time of purchase, in addition to the $2.00 fee. After paying the entire sales price at the time of purchase, he must file a claim with Blue Shield seeking reimbursement. Thus, an insured has the additional burden of filing a claim for reimbursement, and he must accept reduced benefits in order to patronize the drug store of his choice.

Having made the above claims, the plaintiffs are immediately confronted with defendant's argument that its activities are exempt from the antitrust laws by virtue of the McCarran Act. The McCarran-Ferguson Act provides that the Sherman Act, the Clayton Act and the Federal Trade Commission Act shall be applicable to the business of insurance only "to the extent that such business is not regulated by state law."

Disputing the applicability of the McCarran Act exemption, the plaintiffs contend that a three-step analysis is necessary to determine whether an insurance company's challenged activities fall within the Act's exemption. First, they contend, the court must determine whether the challenged activities constitute the "business of insurance." Second, it must determine whether the activities in question are regulated by state law. Third, the court must determine the presence or absence of boycott, coercion, or intimidation.[3] The latter requirement derives from Section 3(b) of the McCarran Act, which states as follows: "Nothing contained in this chapter shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate or act of

---

**3.** A negative finding for the first question obviates the necessity for a determination with respect to the second and third steps, and precludes application of the McCarran Act. *SEC*

*v. Nat'l Securities, Inc.*, 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969); *American General Insurance Co. v. FTC*, 359 F.Supp. 887 (S.D. Tex.1973), aff'd., 496 F.2d 197 (5th Cir. 1974).

boycott, coercion or intimidation." 15 U.S.C. § 1013(b) (1970).

### III. *Do the Defendants' Activities Constitute the Business of Insurance?*

■ The stepping off point of our analysis is the general principle that statutory exceptions to the antitrust laws "are to be strictly construed." *Abbott Labs v. Portland Retail Druggists Ass'n, Inc.,* 425 U.S. 1, 96 S.Ct. 1305, 47 L.Ed.2d 537 (1976); *FMC v. Seatrain Lines, Inc.,* 411 U.S. 726, 93 S.Ct. 1773, 36 L.Ed.2d 620 (1973). The notion that "our cases have repeatedly established . . . a *heavy presumption against* implicit [antitrust] exemptions" was recently reaffirmed in *Abbott Labs., supra.*[4] Moreover, it is clear that merely because challenged conduct has been engaged in by an insurance company does not dictate its characterization as the "business of insurance" under the McCarran Act. *SEC v. National Securities, Inc.,* 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969). The question presented under the McCarran Act, therefore, "is whether the activities complained of, *even though they may be actions taken by an insurance company,* are part of the 'business of insurance' which Congress sought to remove from federal regulation." *Fry v. John Hancock Mutual Life Ins. Co.,* 355 F.Supp. 1151, 1153 (N.D.Tex.1973) (emphasis added).

In *National Securities* the Supreme Court held that the "business of insurance" included (1) "the relationship between insurer and insured," (2) "the type of policy which could be issued, its reliability, interpretation and enforcement;" (3) "other activities which relate . . . to their status as reliable insurers." Relying on the first of these definitions, the plaintiffs note that the McCarran Act's focus is on the relationship between the insurer and the insured. The plaintiffs argue that a crucial determination is the question how closely the challenged activity concerns the relationship be-

tween the insurance company and the policyholder. The activities challenged herein, according to the plaintiffs, relate primarily to relationships other than that between the insurer and its policyholders and therefore are not peculiar to the insurance industry. The plaintiffs concede that there may be effects on policyholders resulting from the Pharmacy Agreement, but they minimize these as peripheral and secondary to the effects on the relationships between competing pharmacies and between such pharmacies and their customers.

■ The defendants contend, and the district court found, that the plan of operation followed by Blue Shield, including the Pharmacy Agreement, relates directly to its status as a reliable insurer. We cannot agree. It is beyond peradventure that every action taken by an insurance company to enhance its status as a "reliable insurer" does not necessarily constitute the "business of insurance" within the meaning of the McCarran Act. Moreover, an agreement which does not otherwise constitute the business of insurance is not automatically embraced within the protection of the McCarran Act simply because it benefits policyholders either directly, or indirectly by strengthening the financial condition of the insurer.

■ Defendants allege that the contractual arrangements between Blue Shield and Participating Pharmacies require nothing more than the performance of obligations owed to Blue Shield's insureds under the drug insurance policies. In concluding that "[t]he Pharmacy Agreement directly pertains to the relationship between Blue Shield and its insureds," the district court held that the Pharmacy Agreement "is simply the performance of the insurer's obligations owed to its insureds under the insur-

---

4. Relying on this general principle, plaintiffs argue that if the challenged activities do not clearly constitute the business of insurance,

they fall outside the McCarran Act's protective umbrella and are subject to the full force and effect of the antitrust laws.

ance contract and nothing more." Despite these characterizations of the contractual arrangement, we find that the agreements between Blue Shield and Participating Pharmacies do not require Blue Shield to fix prices or to produce other anticompetitive effects in the pharmaceutical industry. Blue Shield's sole obligation is to see that the insured receives prescription drugs and "shall be required to pay no more than the drug deductible for each of such covered drugs." It is unnecessary for Blue Shield to agree with pharmacies to fix retail sales prices in the pharmaceutical industry. Blue Shield's policyholders are basically unconcerned with the contract between the insurer and the Participating Pharmacy. They are obligated to pay a Participating Pharmacy two dollars ($2.00) for a prescription regardless of the presence or absence of a price fixing arrangement. Thus, by minimizing costs and maximizing profits, the Participating Pharmacy Agreements inure principally to the benefit of Blue Shield.

The plaintiffs attempt to illustrate by example that the relationship primarily affected by the Pharmacy Agreement and the alleged coercion is that between competing pharmacies and not the relationship between insurer and insured. If the challenged activities in this case are held to constitute the business of insurance, they contend, then automobile insurers will be able to utilize Participating Repair Shop Agreements and coercion to fix prices for parts and labor in the automobile industry. Similarly, they contend that fire insurance companies would be able to execute Participating Construction Company Agreements and thereby combine and conspire with large construction companies to set prices for the repair and rebuilding of homes or buildings damaged by fire. The plaintiffs contend that Congress never intended that the McCarran Act be utilized to shield such activities from application of the federal antitrust laws. They note that Congress, in enacting the McCarran Act, may have condoned state supervised rate setting, but Congress was opposed to private price fix-

ing and did not intend that such activity be shielded from federal scrutiny.

The defendants argue that the Pharmacy Agreement is so inextricably intertwined with the policies that it would be impossible for Blue Shield to fulfill its contractual obligations to its insureds in the absence of such agreements with the pharmacies. The defendants also dispute plaintiffs' arguments that if Blue Shield's activities are permitted, automobile insurers will utilize Participating Repair Shops and fire insurance carriers will enter into Participating Construction Company Agreements. The defendants contend that the types of insurance referred to by the plaintiffs are not at issue here and such types of insurance are regulated by the provisions of the Texas Insurance Code which are not similar to the ones involved in this case. They also contend that Blue Shield was statutorily required to submit the policies to the state board prior to issuance or use and that the Commissioner authorized the use of the policy and Pharmacy Agreement. Finally, they contend that the activities suggested in the hypothetical examples would require careful examination of the existing laws and regulatory devices relating to automobile insurance and fire insurance. In short, they contend that these hypotheticals are nothing more than speculation and conjecture.

We conclude that Blue Shield is no more obligated to fix the retail prices of pharmaceuticals than an automobile insurer is obligated to its insureds having deductible policies to fix the prices charged for parts and labor. Just as the automobile insurer is obligated to pay the cost of repair, whatever it might be, over and above the applicable policy deductible, Blue Shield is obligated to pay the cost of prescription drugs over and above the two dollar ($2.00) drug deductible. Even though an automobile insurer might be able to guarantee by contract that repairs are done for its customers on a "cost" basis, thereby achieving increased profits or reduced rates, such agree-

ments do not thereby become immune from antitrust scrutiny. *Contra, Proctor v. State Farm Mutual Insurance Co.*, 406 F.Supp. 27 (D.D.C.1975).

The plaintiffs next contend that the Pharmacy Agreement produces results far beyond the simple performance of Blue Shield's responsibilities owed to its insureds under The Prescription Drug Insurance Policy. Blue Shield itself may have recognized that the Pharmacy Agreement goes beyond its obligations under the prescription plan. The plaintiffs introduced into evidence a letter between two Blue Shield executives which indicated a concern over antitrust problems and suggested that the company camouflage the price fixing arrangement as a "mass accounting agreement." The evidence introduced in the trial court stated as follows: "I think it would be best to draft the contract so that the Insurance Board would require filing of the mass accounting agreement [Pharmacy Agreement] to strengthen your base on anti-trust. Drafting problems will get sticky here, but let's pass on that for now." The plaintiffs contend that this letter carries the Blue Shield plan far beyond the protection of the McCarran Act. They contend that Congress did not contemplate or intend that the McCarran Act should shield from antitrust scrutiny any insurance company's efforts to control the magnitude of its policyholder's claims through the elimination of price and other forms of competition in the industries providing goods and services covered by the insurance policy. Since these activities are not regulated by the State, they contend that the McCarran Act exemption does not apply.

We find that the Pharmacy Agreement goes beyond Blue Shield's obligations as an insurer and places the firm in the business of providing products and services. Blue Shield has agreed to provide protection against the risk that a policyholder will require pharmaceuticals. In order to meet that obligation, Blue Shield is not required to guarantee the provision of services on a "cost-plus" basis or any other basis which might be more economical than the retail purchase of such products. That Blue Shield may wish to protect itself and its customers from rising costs in the pharmaceutical industry does not transform the Pharmacy Agreement into the business of insurance. In fact, the best way for the firm to protect itself from rising costs is to establish and periodically adjust its rate structure to reflect the impact of inflation. Such measures, which are by no means foreign to the insurance business, involve far less intrusion into the pharmaceutical industry and, consequently, avert the potentially anticompetitive effects alleged here.

The plaintiffs next attempt to come to grips with *Travelers Insurance Company v. Blue Cross*, 481 F.2d 80 (3rd Cir.), *cert. denied*, 414 U.S. 1093, 94 S.Ct. 724, 38 L.Ed.2d 550 (1973), by arguing that the McCarran Act does not apply *ipso facto* to every direct contractual relationship between an insurance company and a provider of benefits. In *Travelers*, the Third Circuit held that the contractual arrangements consummated between Blue Cross and various hospitals for the furnishing of services under insurance policies constituted the business of insurance and, thus, the relationship fell within the McCarran Act exemption. There, as here, the relationship was a direct contractual relationship the result of which was the performance of obligations owed to the insured by the insurer on an economically favorable basis. The plaintiffs have attempted to distinguish *Travelers* by arguing that the Third Circuit was merely approving the actions of the Insurance Commissioner of Pennsylvania who was exerting pressure on the large insurance companies to exercise their power over hospitals to reduce hospital costs. This interpretation, with which we agree was adopted in *Doctors, Inc. v. Blue Cross*, 431 F.Supp. 5 (E.D.Pa.1975), *aff'd. per curiam*, 557

F.2d 1001 (3d Cir. 1976).[5] Moreover, the *Travelers* decision was based in large measure on the Pennsylvania legislature's control over rates charged by non-profit hospitals. That regulation was undertaken pursuant to a statutorily created interrelationship between the rates charged by nonprofit health insurers and nonprofit hospitals, which interrelationship was to be regulated by the Pennsylvania Insurance Department. The plaintiffs note that the Texas Legislature has not chosen indirectly or directly to control the rates charged by pharmacies either by directing and controlling contracts between insurers and pharmacies or by creating an interrelationship between the rates charged by pharmacies and those charged by insurers. Since *Travelers* held simply that the contract between a nonprofit health insurer and a nonprofit hospital was shielded by the McCarran Act from attack, *Travelers* carries little precedential value in this appeal.

Rather, the instant case is more nearly akin to *Battle v. Liberty Nat'l Life Ins. Co.*, 493 F.2d 39 (5th Cir. 1974), *cert. denied*, 419 U.S. 1110, 95 S.Ct. 784, 42 L.Ed.2d 807 (1975). In *Battle* several funeral homes and directors brought suit against an insurer, which issued burial policies, and the insurer's wholly owned subsidiary which supplied merchandise and services required by the insurer's policies. Although this court found coercion with respect to the insurer's discrimination in benefits, the court felt that the facts were inadequately developed to make a conclusive determination on the McCarran Act issue. Nonetheless, the court stated as follows: "[I]t might be plausibly argued that these facts do not constitute the business of insurance as contemplated by the McCarran Act and thus do not fall within its exemption.[6]" The court noted that the obligations under the insurer's arrangement might be related to the business of insurance, but the obligations were so remotely related as to be subject to the antitrust laws. Relying on *Battle*, the plaintiffs argue that the defendants' activities challenged herein are not peculiar to the insurance industry and are not the business of insurance. They argue that by providing markedly decreased benefits to those subscribers who patronize a nonparticipating pharmacy, Blue Shield intentionally and overtly coerces its subscribers to boycott these pharmacies. Not only does this boycott operate to coerce the nonsigning pharmacies to participate in the plan, it also forecloses nonsigning pharmacies from a significant portion of the market and secures for participating pharmacies the sales of prescription drugs required by Blue Shield's claimants. Since this activity is not peculiar to the insurance industry, plaintiffs argue that it does not constitute the business of insurance. As in *Battle*, the contractual agreements here under review are somewhat related to the business of insur-

---

5. The court indicated the narrow scope of *Travelers* as follows:

   It is therefore readily apparent from the reading of the *Travelers* case that the Third Circuit is approving the *actions of the Insurance Commissioner of Pennsylvania when he exerts pressure* on the large insurance companies to get them to exercise their power over hospitals to force the hospitals to cut costs wherever possible. This is exactly what Blue Cross was doing in our case at the bequest of the Insurance Commissioner. Therefore, since the McCarran-Ferguson exemption was applicable in Travelers . . ., I hold today that the McCarran-Ferguson exemption is applicable in *Doctors, Inc.* . . . .. *Doctors, Inc. vs. Blue Cross*, 431 F.Supp. 5, 10 (E.D.Pa.1975), *aff'd* 557 F.2d 1001 (3d Cir. 1976) (emphasis added).

6. The Court stated:

   It appears that, since the insurance contract confers far more benefits upon the policyholder if he uses an authorized funeral home, the policyholder is subtly coerced into dealing only with the authorized home. The imposition of this restraint would effectively foreclose the unauthorized funeral director's access to a substantial portion of the market. 493 F.2d at 44 45.

   The court held that these facts "if established, would tend to support a finding of unreasonable restraint of trade." 493 F.2d at 44.

ance. The relationship, however, is so attenuated that it must be subject to the antitrust laws. As the plaintiffs have so well articulated, "it is not the office of the insurance industry to set the prices in the various sectors of our economy so that insurers will enjoy an added measure of control over the magnitude of individual claims."

■ The plaintiffs next take issue with the finding of the district court that a 1962 Opinion of the Texas Attorney General has concluded that the challenged activity constitutes the business of insurance. The court read the 1962 Opinion as a determination by the Texas Attorney General that a plan "substantially similar" to Blue Shield's plan constituted the business of insurance. Plaintiffs contend that the Attorney General's Opinion held only that the particular firm in question was an insurance company and not that a program substantially similar to Blue Shield's constituted the business of insurance. The plaintiffs allege that the Attorney General's Opinion was based strictly on the facts presented and that it bears no logical relevance to the question whether the activities challenged in this suit constitute the business of insurance. Although the 1962 opinion is not without ambiguity, it appears to focus on the status of the company itself; it does not conclusively establish whether the State considers a plan such as Blue Shield's Pharmacy Agreement to constitute "the business of insurance." Thus, we are compelled to eschew the heavy weight usually given a state's determination that an activity constitutes the "business of insurance" in favor of the interpretation given the term by the federal courts. See SEC v. Variable Annuity Co., 359 U.S. 65, 69, 79 S.Ct. 618, 3 L.Ed.2d 640 (1959).

The State has shed very little light on this matter since the 1962 Attorney General's Opinion discussed above. Although the plaintiffs argue that the State Board of Insurance does not consider The Pharmacy Agreement to encompass or constitute the business of insurance, it is by no means

clear that the State has even considered the question. The district court concluded that "[t]he State of Texas has actively regulated the activities challenged in plaintiff's complaint since the inception of Blue Shield's Prescription Drug Insurance *Program*." (emphasis added). Plaintiffs contend that the State uses the word "program" loosely in that the Board of Insurance approved nothing more than the insurance policy itself and it did not consider the Pharmacy Agreement, which is at issue in this case.

It is clear from the record that the Board has never approved the Pharmacy Agreement, and the Division Manager of the Board's Policy Approval Division, a Mr. Pogue, testified that he thought the Pharmacy Agreement was outside of the State's regulatory control. He stated as follows: "I do not feel that a contract of that nature falls within the jurisdiction of the State Board of Insurance." Plaintiffs argue that the Pharmacy Agreement does not fall within the jurisdiction of the State Board of Insurance simply because it does not constitute the business of insurance.

There is some testimony which contradicts the testimony of Mr. Pogue. A former employee of the State Board of Insurance, a Mr. Connor, gave an arguably contradictory response to what the plaintiffs describe as a "convoluted question" concerning the exemption of Blue Shield's Prescription Drug Insurance Policy form. With respect to this exemption, the following exchange took place between counsel for Blue Shield and Mr. Connor:

Q. [By Mr. Kaiser] . . . Mr. Connor, at the time of the issuance of this Exemption Order that you are looking at right now, was it your opinion that this particular contract which is marked Deposition Exhibit 52 [the Prescription Drug Insurance Policy], along with the Participating Drug Pharmacy Agreement which Blue Shield proposed to issue, was it your opinion *that that* constituted the business of insurance?

A. [Mr. Connor] Yes.

Plaintiff concedes that one might draw from this exchange that Connor thought the Pharmacy Agreement was a part of the business of insurance. Plaintiffs argue, however, that the phrase "that that" leaves the issue in doubt because Connor may have understood the phrase "that that" to refer only to the policy itself and not to the Pharmacy Agreement. This position is bolstered by Connor's earlier testimony, wherein he stated that he did not recall having occasion to review the Pharmacy Agreement before drafting the Exemption Order and that he had "no recollection of receiving the document."

The testimony of these officials, therefore, at best raises a factual issue concerning the State's position. It, like the 1962 Attorney General's Opinion, is not a definitive statement of the State's position.

The defendants nonetheless place great emphasis on the extent of state regulation and attempt to minimize plaintiffs' arguments concerning the "business of insurance." They rely on *Crawford v. American Title Ins. Co.,* 518 F.2d 217 (5th Cir. 1975), where this court held that pervasive regulation by the State of Alabama over antitrust matters in the insurance industry precluded application of the federal antitrust laws. The problem with the defendants' position is that the McCarran Act applies only when the activity concerned is the business of insurance *and* the activity is regulated by the State. In *Crawford* there was no question that the challenged conduct constituted the business of insurance; rather, the issue was the extent and pervasiveness of state regulation. There seems to be no question that the State of Texas regulates the insurance industry quite vigorously, but there is no similar indication that the activities complained of are considered the business of insurance by the State or by any common sense interpretation of that term.[7]

We recognize that several district courts have rendered decisions contrary to the conclusion we reach today. *Manasen v. California Dental Services,* 424 F.Supp. 657 (N.D.Cal.1976); *Proctor v. State Farm Mutual Insurance Co.,* 406 F.Supp. 27 (D.D.C. 1975); *Schwartz v. Commonwealth Land Title Insurance Co.,* 374 F.Supp. 564 (E.D. Pa.1974), subsequent proceedings reported at 384 F.Supp. 302 (E.D.Pa.1974); *Nankin Hospital v. Michigan Hospital Service,* 361 F.Supp. 1199 (E.D.Mich.1973); *California League of Independent Insurance Producers v. Aetna Casualty & Surety Co.,* 175 F.Supp. 857 (N.D.Cal.1969). Indeed, two such cases have been affirmed on appeal. *Anderson v. Medical Service of the District of Columbia,* 551 F.2d 304 (4th Cir. 1977); *Frankford Hospital v. Blue Cross,* 554 F.2d 1253 (3d Cir. May 2, 1977). Perhaps the most far-reaching of these is the *Manasen* case, in which the district court concluded that the McCarran Act exemption applied to a nonprofit corporation engaged in the administration and operation of prepaid dental care programs. The defendant corporation administered prepaid dental care plans under agreements and contracts with various subscriber groups and subscribing purchasers, including governmental bodies, employer organizations, and joint employer-labor trust funds. The subscribers paid periodic premiums to CDS in exchange for future dental services performed for individuals on whose behalf the premiums were paid.

██ Professional services were performed by practicing dentists who were classified by CDS as "participating" or "nonparticipating" dentists. In order to attain the "participating" status, a dentist was required to look solely to CDS for payment and to set patients' fees at levels not in excess of the amounts established in

---

7. The McCarran Act likewise affords no antitrust exemption to the so-called noninsurance company defendants who are parties to this litigation. Indeed, it would be highly anomalous for this court to conclude that the sale of pharmaceuticals by these defendants constitutes the "business of insurance" for purposes of federal antitrust law.

a CDS approved fee schedule. Any dentist who did not agree to limit his fees to the range specified by CDS would be classified by the corporation as "nonparticipating." Covered patients who selected participating dentists to perform services would receive full benefits under the program. Patients seeking care from nonparticipating dentists, however, would receive less than the full benefits from CDS. The plaintiffs alleged that this arrangement had the effect of excluding nonparticipating dentists from the CDS market since a CDS patient who sought services from a nonparticipating dentist suffered a financial detriment. Although the defendant corporation was not an insurance company, the court concluded that it was engaged in the business of insurance for McCarran Act purposes. The court placed considerable weight on the favorable impact of the arrangement on the company's insurance rates:

> It is undisputed that the level of dentists' fees are a major factor in determining policy premiums. CDS' payment arrangements to service providers are critical elements in CDS' contractual agreements with its subscribers. These arrangements are intimately related to the interpretation and implementation of CDS' policies and to its reliability as an insurer. Accordingly, the Court finds that the activities challenged in the instant complaint constitute part of the "business of insurance" within the meaning of the McCarran Act.

424 F.Supp. at 666–67 (footnote omitted). We find ourselves in serious disagreement with the rationale underlying the *Manasen* decision. An activity is not a part of the business of insurance solely because it has an impact, favorable or otherwise, upon premiums charged by the insurer. Monopolistic or coercive activities in "provider industries" may often have a favorable economic impact upon the rates or the costs of insurance companies. But such practices do not become clothed with McCarran Act protection simply because an insurance company has contracted to pay the provider for products or services.

In *SEC v. Nat'l Securities Inc., supra,* the Supreme Court held that the activity of two insurance companies in merging did not constitute the business of insurance, despite the fact that the transaction undoubtedly affected policyholders in terms of the security of their insurance contracts and the reliability of their insurers. Moreover, business activities of insurance companies not peculiar to the insurance industry are outside the scope of the McCarran Act. *Center Ins. Agency v. Byers,* (N.D.Ill.1976); *American Family Life Assurance Co. v. Planned Marketing Associates,* 389 F.Supp. 1141 (E.D.Va.1974); *American General Ins. Co. v. FTC,* 359 F.Supp. 887 (S.D.Tex.1973), aff'd 496 F.2d 197 (5th Cir. 1974). As indicated by the activities of the noninsurance company in *Manasen, supra,* the activity complained of by plaintiffs is not peculiar to the insurance industry. To be sure, price fixing and coercion induced by firms with superior bargaining power are often found in all industries. Thus, Blue Shield's attempts to control costs in the pharmaceutical industry might just as easily be undertaken by a noninsurance firm attempting to meet a contractual obligation to deliver drugs to a wholesale or retail purchaser.

*Manasen* and other cases have emphasized the favorable impact that price fixing and coercion have had on insurance premiums and the "reliability" of the insurers. It is conceivable that the public might benefit from price fixing arrangements as long as the parties to the arrangement agree to keep prices below free market levels. The Congress, however, has foreseen that the power to fix prices might not always be beneficially administered by those parties holding the power once their competition has been put out of business. It is quite clear that competitors can be destroyed by those whose financial resources permit them to reduce prices until their competition is eliminated, only for the purpose of raising prices in the long run. Whether such economic coercion is proper is not for a

court to decide. It is a matter of national policy which has been addressed by the Congress, from which any change will originate only after appropriate investigation, hearings and deliberation. We apply the law as presently determined by the Congress and we hold that the antitrust laws are applicable to the arrangements challenged herein.

We conclude, therefore, that Blue Shield's Pharmacy Agreement is not a part of the business of insurance and is not shielded from antitrust scrutiny even though it may have some effect upon the company's policyholders and rates.

REVERSED.